587 F.2d 1322
 190 U.S.App.D.C. 425, 4 Media L. Rep. 1634
 PUBLIC MEDIA CENTER, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Thunderbird Broadcasting Co., Richardson Broadcasting Co.,
and Joseph Gamble Stations, Inc., Intervenors.
 No. 76-1648.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 28, 1978.
Decided Oct. 24, 1978.
 
 Harvey J. Shulman, Washington, D. C., with whom Collot Guerard and Carol J. Jennings, Washington, D. C., were on brief, for petitioners.
 C. Grey Pash, Jr., Counsel, F.C.C., Washington, D. C., with whom Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Barry Grossman and Peter L. de la Cruz, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.
 Randy I. Bellows, Washington, D. C., also entered an appearance for petitioners.
 
 
 1
 Susan J. Atkinson, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent, United States of America.
 
 
 2
 Stephen A. Sharp and Keith H. Fagan, Counsel, F.C.C., Washington, D. C., also entered appearances for respondent, F.C.C.
 
 
 3
 Nathaniel F. Emmons, Washington, D. C., entered an appearance for intervenor, Thunderbird Broadcasting Co.
 
 
 4
 Benito Gaguine, Washington, D. C., entered an appearance for intervenor, Richardson Broadcasting Co.
 
 
 5
 Jack P. Blume, Herbert M. Schulkind, and Howard J. Braun, Washington, D. C., entered appearances for intervenor, Joseph Gamble Stations, Inc.
 
 
 6
 Before DANAHER, Senior Circuit Judge, and TAMM and ROBB, Circuit Judges.
 
 
 7
 Opinion for the court filed by TAMM, Circuit Judge.
 
 TAMM, Circuit Judge:
 
 8
 Petitioners, Public Media Center, et al.,[1] seek reversal of a Federal Communications Commission (Commission) decision[2] holding that four California radio stations did not violate the fairness doctrine when they broadcast advertisements promoting the desirability of nuclear generation of electrical power. Because the Commission has not adequately distinguished these four stations from eight others found in violation of the fairness doctrine, we remand the Commission's order for clarification.
 
 
 9
 * In September 1974, the petitioners filed a fairness doctrine complaint against sixteen California radio stations[3] alleging that the stations had failed to meet their obligation to present both sides of the debate surrounding the construction and use of nuclear power plants. Specifically, the petitioners charged that the radio stations had broadcast advertisements for the Pacific Gas & Electric Company (PG&E) advocating the development of nuclear power but had failed to present the views of those opposed to such development.[4]
 
 
 10
 In response to the complaint, the Commission requested comments from each of the sixteen stations. The licensees answered by claiming, Inter alia, that the PG&E advertisements did not address a controversial issue of public importance,[5] that the advertisements did not present a point of view on the use of nuclear energy,[6] and that broadcasters had fulfilled their obligations under the fairness doctrine.[7]
 
 
 11
 Following the filing of these comments, the petitioners pressed their complaint against thirteen of the original sixteen stations.[8] The petitioners' reply manifested a twofold concern whether any anti-nuclear programming would be broadcast and the form in which such programming would be presented. Specifically, the petitioners presented a ten-factor analysis[9] of each station to support their contention that licensees had not provided a reasonable opportunity to present anti-nuclear viewpoints. For example, the petitioners argued that station KPAY had not fulfilled its fairness obligations even though it had broadcast sixty minutes of anti-nuclear programming as compared with twenty-seven minutes of pro-nuclear programming.[10] Characterizing total time as "the most inaccurate way to measure . . . reasonableness,"[11] the petitioners found that: none of the anti-nuclear programming appeared in prime, or drive, time,[12] whereas nine minutes were devoted to pro-nuclear programming; pro-nuclear programming appeared on the air twenty-seven times, while anti-nuclear programming was broadcast only twice; pro-nuclear programming was presented during periods of higher listenership than anti-nuclear programming; pro-nuclear programming was broadcast on twenty-six days as compared with anti-nuclear programming that appeared on one day; pro-nuclear programming utilized "the effective short format of a spot ad interspersed within other programming," while anti-nuclear programming appeared in longer length public affairs programming; pro-nuclear programming appeared in similar PG&E advertisements repeated twenty-seven times, but anti-nuclear views were repeated only twice; pro-nuclear programming reached a more varied audience; and pro-nuclear programming appeared in professionally produced advertisements, whereas anti-nuclear programming consisted of a public affairs discussion by two professors.[13] These factual differences, the petitioners alleged, compelled the conclusion that KPAY's presentation of anti-nuclear viewpoints was unreasonable. Similar factual analyses of each of the remaining twelve stations yielded the same conclusion.[14]
 
 
 12
 The Commission found that the PG&E advertisements addressed a controversial issue of public importance.[15] The Commission then sought to determine whether each of the licensees had met its "fairness doctrine obligation to afford a reasonable opportunity for presentation of viewpoints contrasting those contained in the PG&E announcements."[16] Prior to reaching a decision on the merits, the Commission noted "a number of factors which are relevant considerations in determining what constitutes a 'reasonable opportunity' for the presentation of contrasting viewpoints. . . ."[17] These factors included the amount of drive time given each side; the total amount of time given each side; the frequency with which each side was presented; and the size of the listening audience.[18] The Commission also stressed, however, that the ultimate standard against which station conduct would be judged was whether the public had been left uninformed as to different viewpoints on the issue.[19]
 
 
 13
 The Commission evaluated each licensee's programming and concluded that eight stations had violated the fairness doctrine,[20] that four stations had not,[21] and that more information was needed to judge the performance of one.[22] The Commission denied petitions for reconsideration filed on behalf of the eight stations that were found in violation of their fairness doctrine obligations.[23] The present petition for review is directed only to the Commission's decision that four stations had not violated the fairness doctrine.[24]
 
 II
 
 14
 The Commission[25] argues that the present controversy has been rendered moot by the passage of time, and thus should be dismissed. As the Commission correctly notes, courts will dismiss appeals as moot when events during the pendency of appeal obviate the possibility of meaningful relief. Alton & Southern Railway Co. v. International Association of Machinists & Aerospace Workers, 150 U.S.App.D.C. 36, 41-42, 463 F.2d 872, 877-78 (D.C.Cir.1972); See Brief for Respondents at 13. The Commission attempts to apply the mootness doctrine to the facts of this case by suggesting that the issue of public importance is no longer controversial because a California initiative referendum on the use of nuclear power was held more than two years ago.[26]Id. at 13-16. Because we are unable to conclude that the desirability of nuclear generation of electrical power is not now a controversial issue,[27] we find that the petition for review is not moot.
 
 
 15
 The presence of the ballot initiative was only one factor used by the Commission in finding that the issue was controversial. In addition to noting the existence of the referendum, the Commission, in its Initial Order & Opinion, specifically relied upon attempts in Congress to deal with the possible danger posed by nuclear power plants.[28] In its Opinion & Order denying the petitions for reconsideration, the Commission reiterated that the ballot initiative was one, but certainly not the only, factor supporting its conclusion of controversiality. As the Commission stated:
 
 
 16
 There is ample evidence to require a finding of controversiality and public importance. Complainants have furnished persuasive evidence that the nuclear power issue was creating vigorous debate nationally and in California. . . . Where an issue is the focus of such substantial national and local attention, as evidenced by comprehensive legislation in Congress, and wide media attention on both national and state-wide levels resulting in vigorous media campaigns . . . (KRED's) view that the issue was not a controversial issue of public importance . . . cannot be held to be reasonable.[29]
 
 
 17
 Thus, in formulating its decision, the Commission expressly relied on congressional debate on the use of nuclear power, the existence of the initiative measure, and local concern over the safety of nuclear power plants.[30]
 
 
 18
 The instant case is distinguishable from National Broadcasting Co. v. FCC, 170 U.S.App.D.C. 173, 252, 516 F.2d 1101, 1180 (1974), Cert. denied, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976), in which, after expenditure of considerable judicial effort,[31] the original judgment of this court was vacated on "consideration of (the Commission's) suggestion of mootness." Id., 170 U.S.App.D.C. at 252, 516 F.2d at 1180. That case concerned a complaint leveled against the National Broadcasting Company charging that its presentation of a documentary report on the status of private pension plans violated the fairness doctrine. The program exposed the overall poor performance of private pension plans and concluded with a plea for legislative reform. After the broadcast, Congress enacted pension reform legislation. Although the general issue of pension plan performance was not extinguished by congressional reform, the issue had become so intertwined with the issue of the need for new legislation that congressional action transformed "what may have been a controversial issue into merely a newsworthy one." Id., 170 U.S.App.D.C. at 256, 516 F.2d at 1184 (Tamm, J., concurring). In this case, however, the Commission failed to demonstrate that the end of the referendum election campaign rendered the nuclear power issue non-controversial in California. Moreover, the Commission has not shown that the other factors supporting its finding of controversiality the existence of national debate and great local concern no longer exist.
 
 
 19
 Because we have not been shown that the issue of nuclear power development is no longer controversial, we cannot conclude, as the Commission urges, that meaningful relief is no longer available. Presumably, if the Commission finds that the four stations have not complied with their fairness doctrine duties, each station could be ordered to inform the Commission of the manner in which each intends to meet its obligation. In addition, the Commission has the power to evaluate fairness doctrine performances in connection with license renewal applications. See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 318-321, 473 F.2d 16, 29-32 (1972), Cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).[32] Thus, a finding that these four stations failed to fulfill their fairness obligations would have continuing legal and practical effect.
 
 III
 
 20
 The fairness doctrine imposes two duties on a broadcaster: (1) it must present coverage of issues of public importance, and (2) such programming must fairly reflect differing viewpoints on controversial issues. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 111, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); Red Lion Broadcasting Co. v. FCC,395 U.S. 367, 377, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). A broadcaster has great editorial freedom in implementing the fairness doctrine, and will violate it only when its actions and decisions have been unreasonable or in bad faith. Straus Communications, Inc. v. FCC, 174 U.S.App.D.C. 149, 156, 530 F.2d 1001, 1008 (1976); Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. at 333, 473 F.2d at 44.
 
 
 21
 If programming addresses one side of a controversial issue of public importance, the Commission must decide whether the broadcaster's overall programming has afforded a reasonable opportunity for the presentation of contrasting points of view. Fairness Report, 48 F.C.C.2d 1, 13 (1974). A survey of Commission precedent reveals that the standard for determining what constitutes a "reasonable opportunity" has yet to be chisled into stone. While its decisions are in accord with this court's general command that "the essential basis for any fairness doctrine . . . is that The American public must not be left uninformed," Green v. FCC, 144 U.S.App.D.C. 353, 359, 447 F.2d 323, 329 (1971) (emphasis in original), the Commission has used differing factors to define a reasonable opportunity. Its decisions have relied upon the amount of time allotted each point of view, Media Access Project, 44 F.C.C.2d 755, 762 (1973); the frequency with which points of view are aired, Id.; WCBS-TV, 9 F.C.C.2d 921, 941 (1967), Aff'd sub nom. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968); the repetitive, continuous nature of programming, Id.; the amount of programming broadcast during prime time, Committee for the Fair Broadcasting of Controversial Issues, 25 F.C.C.2d 283, 293 (1970); and on occasion, the Commission has acted without explicit reference to any of these factors, Wilderness Society, 31 F.C.C.2d 729 (1971). As then Commission Chairman Burch stated, "in the fairness area, the bond of theory and implementation has come unstuck and all the principal actors licensees, public interest advocates, the Commission itself are in limbo, left to fend for themselves." Id. at 34 (Burch, Ch., concurring).[33]
 
 
 22
 Perhaps in response to comments such as those made by Chairman Burch, in 1974 the Commission established criteria against which licensee judgments could be evaluated:
 
 
 23
 We have made it clear, for example, that "it is patently unreasonable for a licensee consistently to present one side in prime time and to relegate the contrasting viewpoint to periods outside prime time. Similarly, there can be an imbalance from the sheer weight on one side as against the other." Committee for the Fair Broadcasting of Controversial Issues, 25 FCC 2d at 293. This imbalance might be a reflection of the total Amount of time afforded to each side, of the Frequency with which each side is presented, of the size of the listening Audience during the various broadcasts, or of a combination of factors.
 
 
 24
 Fairness Report, 48 F.C.C.2d at 17 (emphasis in original). Thus, in the instant case, the Commission "reviewed the reasonableness of the licensee's judgments on the basis of the amount of time, frequency and placement of presentation of the opposing views in the licensee's overall programming."[34]
 
 
 25
 Examination of the Commission's Initial Opinion & Order suggests that the twelve stations were grouped into three categories. First, the Commission found that KATY, KJOY, KPAY, and KVON met the requirements of the fairness doctrine based on the amount of time pro-nuclear views were broadcast as compared with the amount of time devoted to anti-nuclear views.[35] This comparison yields a total time ratio of pro-nuclear to anti-nuclear programming that ranged from .45 (KPAY) to 1.4 (KVON). Second, KFOG, KFRE, and KSRO were found to have failed to meet their fairness obligations. None of these stations had a total time ratio as low as the highest of the stations in the first group. Compare KFOG (3.2) And KFRE (3.3) And KSRO (3.8) With KVON (1.4). However, before reaching its decision, the Commission also discussed the frequency of programming of these three stations, and, with regard to KRFE and KSRO, the disparity of audience size. Third, KFYV, KMBY, KRED, KROY, and KSMA were all adjudged to be in violation of the fairness doctrine. This determination was based on a comparison of the total time devoted to pro-nuclear and anti-nuclear broadcasts and the Commission's belief that the station had not made a diligent attempt to find anti-nuclear spokesmen. Three of these five stations failed to broadcast any anti-nuclear views. The total time ratio of each of the remaining two stations was not as low as the highest of the stations in either the first or second group. Compare KROY (12) And KFYV (43) With KSRO (3.8) And KVON (1.4).
 
 
 26
 Were it not for the Commission's own representations, we might conclude that the total time ratio was the sole criterion distinguishing those stations that met their fairness obligations from those stations that did not. However, the Commission explicitly stated:
 
 
 27
 There is no merit to (the) contention that we found reasonable only those broadcasters which gave more time to the "anti-nuclear" proponents. (See paragraph 57 in the May 18 opinion regarding KVON.) This indicates a misreading of the case and of our normal process of review of fairness doctrine complaints. As is clearly stated in the May 18 opinion (paragraph 43), on each instance we reviewed the reasonableness of the licensee's judgments on the basis of the amount of time, frequency and placement of presentation of the opposing views in the licensee's overall programming. In determining the reasonableness of the licensee's judgments in this matter, we looked at the totality of the circumstances, taking every relevant factor into consideration. As we have stated before, however, there is no precise formula for determining reasonableness.[36]
 
 
 28
 We interpret this explanation to mean that the Commission's decision was not based exclusively on the total time ratio.[37] Thus, we search the Commission's opinion for another explanation of why four stations differed from eight others.
 
 
 29
 We begin by noting each of the other factors considered by the Commission: frequency of program presentation, placement of programming in drive time, and the diligence with which stations sought out anti-nuclear spokesmen. To compute frequency, we divide the total number of pro-nuclear broadcasts by the total number of anti-nuclear broadcasts.[38] The four stations found to have fulfilled the fairness doctrine had the following ratios: KVON (13.4), KPAY (13.5), KJOY (25), KATY (28.8). The stations found to have violated the fairness doctrine included: KSRO (8.6), KFYV (21.7), KFOG (27.4), KROY (72), KFRE (83), KRED (96/0), KMBY (104/0), KSMA (160/0). KSRO's ratio is obviously lower than any of the stations absolved of the fairness charges, KFYV's ratio is lower than either KATY or KJOY, and KFOG's ratio is lower than KATY's.
 
 
 30
 We analyze the placement of presentations by comparing the ratio of minutes of pro-nuclear drive time programming with the total minutes of anti-nuclear drive time programming. The ratios of the four stations in compliance were: KATY (72/0), KJOY (23/0), KPAY (9/0), KVON (14.7). The stations found in violation of the fairness doctrine were: KFOG (83/0), KFYV (34/0), KFRE (44/0), KMBY (28/0), KRED (56/0), KROY (29/0), KSMA (74/0), KSRO (17.2).[39] The stations are thus indistinguishable on this ground.
 
 
 31
 The last factor that the Commission considered was the diligence with which four stations sought anti-nuclear programming. Our evaluation of the record indicates that this factor might be a variant of the total time test. The stations noted for lack of diligence included KMBY, KRED, and KSMA, the only three that had not aired any anti-nuclear programming, and KFYV, the station with the highest total time ratio. Even if this factor provides an independent analytical criterion, it does not distinguish the remaining stations found in violation of the fairness doctrine from those found in compliance.
 
 
 32
 We cannot affirm a Commission order that does not clearly and explicitly articulate the standards which govern the behavior both of licensees that have violated the fairness doctrine and those that have not. Straus Communications, Inc. v. FCC, 174 U.S.App.D.C. at 159, 530 F.2d at 1011. In particular, we recognize the principle established in Melody Music, Inc. v. FCC, 120 U.S.App.D.C. 241, 244, 345 F.2d 730, 733 (1965) that the Commission is under a continuing obligation to "explain its reasons and do more than enumerate factual differences, if any, between (licensees); it must explain the relevance of those differences to the purposes of the Federal Communications Act." This court has regularly recognized the importance of the Melody Music doctrine, See Greyhound Corp. v. ICC, 179 U.S.App.D.C. 228, 232, 551 F.2d 414, 418 (1977) (per curiam); Garrett v. FCC, 168 U.S.App.D.C. 266, 270 & n.25, 513 F.2d 1056, 1060 & n.25 (1975); Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 183 & n.55, 454 F.2d 1018, 1026 & n.55 (1971); Burinskas v. NLRB, 123 U.S.App.D.C. 143, 148 & n.5, 357 F.2d 822, 827 & n.5 (1966), as has the Commission, See Cosmopolitan Broadcasting Corp.,61 F.C.C.2d 257, 261-2 (1976); KFPW Broadcasting Co., 47 F.C.C.2d 1090, 1095 (1974); Channel 13 of Las Vegas, Inc., 37 F.C.C.2d 518, 522-23 (1972); RCA Alaska Communications, Inc., 25 F.C.C.2d 939, 940 (1970); Continental Broadcasting, Inc., 17 F.C.C.2d 485, 487-88 (1969), Aff'd 142 U.S.App.D.C. 70, 439 F.2d 580 (1971).[40]
 
 
 33
 The Melody Music doctrine flows naturally from the functional relationship existing between reviewing court and administrative agency. Although our judicial duties demand great deference to agency expertise, we cannot defer, indeed we cannot even engage in meaningful review, unless we are told Which factual distinctions separate arguably similarly situated licensees, and Why those distinctions are important. As this court has repeatedly emphasized, "the failure of an administrative agency to articulate the reasons for a particular decision makes meaningful review of that decision impossible." American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 626, 646, 494 F.2d 925, 945, Cert. denied, 419 U.S. 882, 95 S.Ct. 148, 149, 42 L.Ed.2d 122 (1974). See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-68, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), Cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).
 
 
 34
 After reviewing the factors considered by the Commission, we are unable to discover the precise factual basis upon which it distinguished the eight stations that violated the fairness doctrine from the four that did not. The Commission's mere insistence that "its conclusions . . . were rational and find ample support in the record," Brief for Respondents at 22, is insufficient. Even if we could discern the factual analysis that led the Commission to the present outcome, we would remain unsatisfied. A reviewing court must be presented with the rationale underlying the importance of factual distinctions as well as the factual distinctions themselves. See American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. at 645-46, 494 F.2d at 944-45. This court continues to insist "that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination." Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. at 393, 444 F.2d at 851 (footnote omitted).
 
 
 35
 Of course, the total time ratio factually separates the twelve stations into two groups consistent with the results of the Commission's order. Nevertheless, we cannot ignore the Commission's statement that its decision was based on all of the relevant factors. We recognize the central tenet of administrative law that a reviewing court may not affirm an administrative agency's actions on a reasoned basis different from the rationale actually put forth by the agency. Gulf States Utilities Co. v. FPC,411 U.S. 747, 764, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Our task is to review the reasoned decision-making of administrative agencies; it is not to guess what an administrative agency might have done under different circumstances. Accordingly, we remand this case to the Commission for clarification of the reasons underlying its determination that KPAY, KJOY, KATY, and KVON did not violate the fairness doctrine.[41]
 
 
 36
 Because of our disposition of this case, we need not consider whether the Commission may, in accord with its past precedent, See Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. at 183, 454 F.2d at 1026, and its statutory mandate, rely on the total time ratio as the sole basis to judge the reasonableness of licensees' actions under the fairness doctrine. The day may come when we will have to decide this question. We decline to do so, however, until the issue arises in a concrete fashion.
 
 IV
 
 37
 For the foregoing reasons, we remand this case to the Commission for clarification of its Opinion & Order.
 
 
 38
 Remanded.
 
 
 
 [1]
 Other petitioners are Friends of the Earth, Californians for Safe Nuclear Energy, California Citizens Action Group, San Francisco Ecology Center, San Francisco Consumer Action, and Zero Population Growth
 
 
 [2]
 Public Media Center, et al. v. KATY, et al., 59 F.C.C.2d 494 (1976); Joint Appendix (J.A.) at 256
 
 
 [3]
 Letter of September 11, 1974 from Public Media Center, Et al. to the Commission regarding fairness doctrine complaints against sixteen California radio stations. J.A. at 1
 
 
 [4]
 Id. at 1-10
 
 
 [5]
 59 F.C.C.2d at 516; J.A. at 285
 
 
 [6]
 59 F.C.C.2d at 513; J.A. at 380
 
 
 [7]
 59 F.C.C.2d at 499, 501, 502, 504, 505, 507; J.A. at 264, 265, 267, 269, 270-71, 273
 
 
 [8]
 The petitioners withdrew their complaints against three radio stations with whom they had reached agreement. J.A. at 78 n.1
 
 
 [9]
 The ten factors included: (1) the appearance of a viewpoint during drive time; (2) the frequency with which a viewpoint appeared; (3) the total amount of time a viewpoint appeared; (4) the appearance of a viewpoint in periods of high listenership; (5) the period of time over which, and regularity with which, a viewpoint appeared; (6) the presentation of a viewpoint on one-sided programming; (7) the presentation of a viewpoint in short announcement format interspersed within other programming; (8) the presentation of a viewpoint in identical and repeated messages; (9) the presentation of a viewpoint to varied audiences; and (10) the presentation of a viewpoint in professionally prepared spots. J.A. at 92-105
 
 
 [10]
 Id. at 108-09
 
 
 [11]
 Id. at 108
 
 
 [12]
 Although television prime time occurs during evening viewing hours, radio prime time is considered to be during drive time those hours in the early morning and late afternoon during which commuter traffic is at its peak
 
 
 [13]
 J.A. at 108-09
 
 
 [14]
 Id. at 106-23
 
 
 [15]
 59 F.C.C.2d at 516; J.A. at 285
 
 
 [16]
 Id
 
 
 [17]
 59 F.C.C.2d at 517; J.A. at 286
 
 
 [18]
 59 F.C.C.2d at 517-18; J.A. at 287
 
 
 [19]
 59 F.C.C.2d at 518; J.A. at 287
 
 
 [20]
 KFOG, KFRE, KFYV, KMBY, KRED, KROY, KSMA, KSRO. 59 F.C.C.2d at 523; J.A. at 294
 
 
 [21]
 KATY, KJOY, KPAY, KVON. 59 F.C.C.2d at 518, 519, 520, 523; J.A. at 287, 289, 290, 293
 
 
 [22]
 KUZZ. 59 F.C.C.2d at 523; J.A. at 294
 
 
 [23]
 Public Media Center, et al. v. KATY, et al., 64 F.C.C.2d 615, 634 (1977); J.A. at 317
 
 
 [24]
 Brief for Petitioner at 2. Licensees of two of the four radio stations, Joseph Gamble Stations, Inc. (KJOY) and Richardson Broadcasting Co. (KPAY) are intervenors in this appeal. Thunderbird Broadcasting Co., licensee of KUZZ, a station ultimately found to be in compliance with the fairness doctrine, is also an intervenor
 
 
 [25]
 The United States did not join this argument. Brief for Respondent at 19 n.8
 
 
 [26]
 The PG&E advertisements were broadcast during a petition drive designed to put the issue of nuclear power plant construction before the voters of California. J.A. at 3. The petition drive was successful. On June 8, 1976, California voters considered an initiative measure that, as summarized by the Attorney General of California:
 After one year, prohibits nuclear power plant construction and prohibits operation of existing plants at more than 60% Of original licensed core power level unless federal liability limits are removed. After five years, requires derating of existing plants 10% Annually unless Legislature, by two-thirds vote, has confirmed effectiveness of safety systems and waste disposal methods. Permits small-scale medical or experimental nuclear reactors. Appropriates $800,000 for expenses of fifteen-person advisory group and for legislative hearings. If the proposed initiative is adopted, undefined additional financing from state sources will be required in the amount of at least $800,000. However, if this initiative should restrict the operation of existing nuclear power plants, and the courts should uphold such action, there is a potential for substantial state damage claims from the owners of the plants.
 J.A. at 283. California voters rejected the proposal, labeled Proposition 15, by a margin of about 2-1. N.Y.Times, June 9, 1976, at 20, col. 5.
 
 
 [27]
 The Commission's brief might be read as arguing that the "issue" of public importance was not the general desirability of nuclear energy but rather, whether the California initiative referendum should have been adopted. The Commission's own conclusion that "each of the PG&E 'nuclear power' announcements directly addressed the issue of the desirability of the immediate implementation of nuclear power and addressed the interrelated issues of the safety and environmental cleanliness of nuclear power," 59 F.C.C.2d at 513; J.A. at 280, clearly refutes this contention
 
 
 [28]
 59 F.C.C.2d at 514-16; J.A. at 283-85
 
 
 [29]
 64 F.C.C.2d at 626-27; J.A. at 312
 
 
 [30]
 64 F.C.C.2d at 627-28; J.A. at 312-13. Furthermore, it does not appear, nor does the Commission now argue, that its decision not to proceed further against the eight stations was premised on a belief that the passage of the election date had rendered the issue non-controversial. Rather, the decision to forego further action was based primarily on the Commission's belief that "each licensee has made some good faith effort to present additional programming before the June 8 election." 64 F.C.C.2d at 629-30; J.A. at 316. The Commission undoubtedly was greatly concerned that fairness doctrine compliance occur prior to the vote on Proposition 15, but this alone cannot refute the Commission's express conclusion that the ballot initiative was only one indication of controversiality
 
 
 [31]
 After a panel of this court vacated and remanded a Commission order finding that a NBC documentary entitled "Pensions: A Broken Promise" had violated the fairness doctrine, 170 U.S.App.D.C. at 177-78, 516 F.2d at 1105-06, a hearing En banc was ordered. Id., 170 U.S.App.D.C. at 227, 516 F.2d at 1155. Subsequently, the order granting a hearing En banc was vacated. Id., 170 U.S.App.D.C. at 228, 516 F.2d at 1156. The original panel then vacated its order, and remanded to the Commission ordering dismissal of the complaint. Id., 170 U.S.App.D.C. at 252, 516 F.2d at 1180
 
 
 [32]
 "Suffice it to say that we regard strict adherence to the fairness doctrine as the single most important requirement of operation in the public interest the 'sine qua non' for grant of a renewal of license (Office of Communications of United Church of Christ v. FCC (138 U.S.App.D.C. 112, 117), 425 F.2d 543, 548 (C.A.D.C.1969))." Comm. for the Fair Broadcast of Controversial Issues, 25 F.C.C.2d 283, 292 (1970)
 
 
 [33]
 See also Simmons, The Problem of "Issue" in the Administration of the Fairness Doctrine, 65 Cal.L.Rev. 546, 586-87 (1977); Comment, The Regulation of Competing First Amendment Rights: A New Fairness Doctrine Balance After CBS, 122 U.Pa.L.Rev. 1283, 1306-07 (1974)
 
 
 [34]
 64 F.C.C.2d at 629; J.A. at 315
 
 
 [35]
 The actual total time figures can be found in tabular form in Brief for Respondent at Appendix A. The actual figures, in minutes, for the twelve stations are: KPAY (27:60), KJOY (229:360), KATY (261:298), KVON (94:66), KFOG (192:60), KFRE (166:50), KSRO (176:46), KROY (72:6), KFYV (64.5:1.5), KRED (96:0), KMBY (104:0), KSMA (160:0)
 
 
 [36]
 64 F.C.C.2d at 629; J.A. at 315
 
 
 [37]
 The Commission's statement might be read as representing only that the total time ratio was not applied to find all stations with a total time ratio of more than one in violation of the fairness doctrine. Of course, this is clear because the Commission found that KVON, with a ratio of 90:66, fulfilled its fairness obligations. We therefore read the Commission's explanation as going beyond this facially obvious point in order to stress that it "looked at the totality of the circumstances taking every relevant factor into account." Id
 At oral argument, counsel for the Commission apparently conceded that the total time ratio did form the basis for the Commission's decision. Responding to a question that inquired how the four stations that fulfilled their fairness obligations could be distinguished from the eight that did not, counsel stated:
 It's clear, your Honor, that the primary consideration which the Commission looked at when it was approaching this was the total number of minutes. I don't think that is necessarily inconsistent with the approach that the Commission has traditionally followed and which this court has articulated in Green (V. FCC, 144 U.S.App.D.C. 353, 447 F.2d 323 (D.C.Cir.1971)) whether or not the public has been left uninformed and that does not read out the fairness doctrine, nor does it shelter the Commission's actions from this court's scrutiny because it involves an element of reasonableness, I think, both on the part of the Commission and on the part of the licensee . . ..
 Nevertheless, we have been instructed not to rely on the Post hoc rationalizations of appellate counsel. FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Even if we were to accept counsel's statement as an explanation for the Commission's action, we could not affirm absent a reasoned explanation of how application of the total time ratio adequately serves the purposes of the fairness doctrine.
 
 
 [38]
 We relied generally upon the facts presented in Brief for Respondent at Appendix A. Where the appendix indicates that non-PG&E pro-nuclear programming was presented, we looked to the licensees' representations, as set out in the Commission's Initial Opinion & Order, 59 F.C.C.2d at 499-509; J.A. at 263-76, in order to compute the total number of pro-nuclear programs presented. Our task was not simplified by the Commission's failure to make specific findings as to the frequency of programming. The actual figures for the twelve stations are: KVON (94:7), KPAY (27:2), KJOY (50:2), KATY (173:6), KSRO (147:17), KFYV (65:3), KFOG (192:7), KROY (72:1), KFRE (166:2), KRED (96:0), KMBY (104:0), KSMA (160:0)
 
 
 [39]
 Brief for Respondent at Appendix A. The actual figures for KVON were 59:4 and for KSRO, 69:4
 
 
 [40]
 Recently, the Commission indicated that Melody Music applies only in license renewal proceedings. Turner Broadcasting Corp., 59 F.C.C.2d 133, 134 (1976). Such a restrictive reading of Melody Music is inconsistent with the Commission's own precedent, See Channel 13 of Las Vegas, Inc., 37 F.C.C.2d 518, 522 (1972); RCA Alaska Communications, Inc., 25 F.C.C.2d 939, 940 (1970), as well as with this court's broader application of that doctrine, See, e. g. Garrett v. FCC, 168 U.S.App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975) (an appeal from the Commission's denial of an application seeking authority to construct facilities enabling a radio station to change from daytime only to unlimited-time broadcasting)
 
 
 [41]
 Because we remand for clarification, we do not confront several issues raised by the petitioners, including whether the Commission disregarded its own precedent, whether the Commission's decision was internally inconsistent, and whether the Commission improperly ignored petitioners' expert testimony. The Commission may reconsider all of these issues on remand. Nor do we pass judgment on the factual issues raised by the petitioners. We have accepted the Commission's interpretation of facts for the purposes of this opinion only to demonstrate that the Commission's order cannot be upheld even on the basis most favorable to it. The Commission will likewise have the opportunity to reconsider its factual judgments on remand