Stanley SPENCER, et al., Plaintiffs,

v.

The NATIONAL LABOR RELATIONS
BOARD, et al., Defendants.

Civ. A. No. 79–2453.

United States District Court,
District of Columbia.

July 1, 1982.

Paul Douglas Kamenar, Washington, D. C., Michael Avakian, Center on National Labor Policy, Inc., North Springfield, Va., for plaintiffs.

Aileen Armstrong, Asst. Gen. Counsel for Sp. Lit., N. L. R. B., Washington, D. C., for defendants.

MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Defendant The National Labor Relations Board has moved the Court to dismiss the instant action on grounds of mootness. Plaintiffs do not oppose the motion to dismiss, but have filed a motion for costs and attorneys' fees pursuant to 28 U.S.C.S. § 2412 (Law.Co-op.Supp.1982), which codifies portions of the recently enacted Equal Access To Justice Act, Pub.L.No. 96–481, Title II, 94 Stat. 2325 (1980), effective October 1, 1981. For the reasons stated herein, the Court agrees that there is no longer a

genuine case or controversy underlying this litigation; accordingly, it will grant defendant's motion to dismiss the action. The Court has also concluded that although plaintiffs are entitled to a judgment for reasonable costs incurred in advancing this litigation, they are not entitled to an award of attorneys' fees under the Equal Access To Justice Act. Plaintiffs' application for fees will therefore be denied.

I. *The National Labor Relations Board's Motion To Dismiss As Moot*

A. *Background*

Plaintiffs, a group of qualified engineers at the Utah Power & Light Company in Salt Lake City, Utah, filed this action on September 17, 1979, seeking, *inter alia,* a declaratory judgment that they are "professional employees" within the meaning of section 2(12) of the National Labor Relations Act, 29 U.S.C. § 152(12) (1976) (hereinafter "the NLRA") and an injunction requiring the National Labor Relations Board (hereinafter "the NLRB" or "the Board") to either conduct a decertification election in response to the petition that plaintiffs had previously filed with the Board,[1] or decide whether they were in fact "professional employees" entitled to vote separately with respect to their previous inclusion in a "mixed" bargaining unit. *See* 29 U.S.C. § 159(b)(1).[2] On November 16, 1979, the Board answered the complaint by denying that plaintiffs were entitled to any of the relief requested and maintaining, *inter alia,* that this Court lacked subject matter jurisdiction over the case, and that plaintiffs had failed to state a claim upon which relief could be granted. Thereafter the parties filed cross-motions for summary judgment.

During the pendency of the respective motions for summary judgment, two of the named plaintiffs in this action filed a second petition for a decertification election

1. Board Case No. 27–RD–459

2. Section 9(b)(1) of the NLRA, 29 U.S.C. § 159(b)(1), prohibits the Board from designating bargaining units composed of both professional and non-professional employees "unless a majority of such professional employees vote

for inclusion in such unit ...." The "mixed" bargaining unit challenged in this case was formed in 1938, almost ten years prior to the passage of the Taft-Hartley amendments which included the above-referenced provision.

on behalf of all qualified engineers at the wholly unionized Utah Power and Light Company.[3] A hearing on that petition was held on April 10, 1981, and the matter was subsequently transferred directly to the Board for a disposition. On September 30, 1981, the Board issued a decision and order finding that plaintiffs qualified as "professional employees" under section 2(12) of the NLRA and were entitled to a separate election on the issue of continued union representation. *See Utah Power & Light Company,* 258 NLRB 138 (1981); Exhibit B To The Board's Motion To Dismiss As Moot. The Board's Regional Director conducted an election on October 29, 1981, and the engineers voted overwhelmingly against continued representation by the incumbent union. Exhibit D To The Board's Motion To Dismiss As Moot.

B. *The Mootness Issue*

 The fundamental principle that Article III courts lack jurisdiction to consider the merits of a moot case stems from the constitutional command that the judicial power extends only to actual "cases" or "controversies". *Powell v. McCormack,* 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1950 n. 7, 23 L.Ed.2d 491 (1969); *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968). The mootness doctrine requires courts to dismiss cases where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. at 496, 89 S.Ct. at 1944; *see also Arizona Electric Power Cooperative, Inc. v. Federal Energy Regulatory Commission,* 203 U.S.App.D.C. 220, 226, 631 F.2d 802, 808 (1980); *Reporters Committee for Freedom Of The Press v. Sampson,* 192 U.S.App.D.C. 335, 341, 591 F.2d 944, 950 (1978). Litigation ordinarily becomes moot "whenever it tenders for judicial resolution no more than an abstract or hypothetical question." *Nader v. Butz,* 154 U.S.App.D.C. 178, 180, 474 F.2d 426, 428 (1972). This may occur when events transpiring after the challenged action obviate or preclude the possi-

bility of meaningful relief. *Public Media Center v. Federal Communications Commission,* 190 U.S.App.D.C. 425, 429, 587 F.2d 1322, 1326 (1978); *Alton & Southern Railway Co. v. International Association of Machinists & Aerospace Workers,* 150 U.S.App. D.C. 36, 41–42, 463 F.2d 872, 877–78 (1972). In that respect, the mootness doctrine requires dismissal whenever "1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, . . . and 2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

 Each of the aforementioned conditions for invoking the mootness doctrine has been satisfied here. Since the onset of this civil action, plaintiffs have received from the Board all of the relief that they sought in federal court; the Board has determined that they are "professional employees" as defined by the NLRA, and has conducted a secret ballot decertification election on their behalf. Thus, even assuming *arguendo* that the Board's earlier failure to adjudicate plaintiffs' professional status and to order a decertification election constituted an actionable violation of a specific statutory prohibition, *see Leedom v. Kyne,* 358 U.S. 184, 188–89, 79 S.Ct. 180, 183–4, 3 L.Ed.2d 210 (1958), that putative violation has been fully corrected by the Board's intervening decision to grant plaintiffs' decertification petition. There is no reasonable expectation that the alleged violation will recur, and there is no longer a "case" or "controversy" justifying the exercise of this Court's decisional and remedial authority. The Board's motion to dismiss must be granted.

II. *Plaintiffs' Motion For Costs And Attorneys' Fees*

A. *Costs*

28 U.S.C. § 2412(a)(1976) provides as follows:

---

**3.** Board Case No. 27–RD–535, Exhibit A To The Board's Motion To Dismiss As Moot.

Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title [28 U.S.C. § 1920], but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

It is manifestly clear under analogous cost-shifting statutes that the phrase "prevailing party" should not be limited to cases in which a party has prevailed through entry of final judgment following a full trial on the merits. For example, the Supreme Court has recently noted that a litigant may be regarded as having "prevailed" for purposes of an award of costs and attorneys' fees under civil rights statutes even if the action is settled by stipulation or consent decree rather than adjudicated on the merits. *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); [4] *see also Foster v. Boorstin,* 182 U.S.App.D.C. 342, 561 F.2d 340 (1977). Moreover, several cases arising both before and after the *Maher* decision have generally held that it is sufficient for purposes of an award of costs and attorneys' fees that the plaintiff succeeded on the "central issue" in his complaint, or achieved *some* of his objectives by compromise. *See e.g., Collins v. Thomas,* 649 F.2d 1203, 1205 (5th Cir. 1981); *Young v. Kenley,* 641 F.2d 192, 194–95 (4th Cir. 1981); *Watkins v. Mobile Housing Board,* 632 F.2d 565, 567 (5th Cir. 1980); *Bonnes v. Long,* 599 F.2d 1316, 1318 (4th Cir. 1979); *Bradford v. Blum,* 507 F.Supp. 526, 529–30 (S.D.N.Y.1981).

While plaintiffs in this action did not secure a favorable decision on the merits of their central legal contention that that Board's denial of their initial decertification petition violated a clear, controlling, and specific provision of the NLRA, they were ultimately successful in obtaining all of the relief that they sought in a judicial forum; namely, a finding by the Board that they were indeed "professional employees" within the purview of 29 U.S.C. § 152(12) and a resultant decision to afford them a separate decertification election. Even if there were no causal nexus whatsoever between the actions of the Board and the prosecution of this lawsuit by the plaintiffs, the Court believes that the Board's intervening decision to effectively moot this action by granting plaintiffs the relief requested and the virtually voluntary dismissal that has followed warrant the conclusion that plaintiffs are "prevailing parties" under 28 U.S.C. § 2412(a). This view fully accords with the trend in recent decisions toward an expansive and liberalized approach to the definition of a "prevailing party" under various fee-shifting and cost-shifting statutes.

In view of the foregoing, the Court finds that plaintiffs are entitled to a judgment for reasonable costs, excluding attorneys' fees, incurred in advancing *this civil action.* An award of costs will be contingent upon the filing of a separate bill of costs.[5]

**B. Attorneys' Fees**

Enacted as a three-year experiment in allocating the costs of litigation involving

---

4. The fact that respondent prevailed through settlement rather than through litigation does not weaken her claim to fees. Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that plaintiff's rights have been violated. *Id.* at 129, 100 S.Ct. at 2575.

Although *Maher v. Gagne* was limited on its facts to a claim for attorneys' fees pursuant to 42 U.S.C. § 1988, its liberal definition of a "prevailing party" is easily transposed to other fee-shifting statutes outside the civil rights domain.

5. Of course, the Board retains the right to contest specific items that plaintiffs may list in their bill of costs.

the United States,[6] the Equal Access To Justice Act (hereinafter "the EAJA") represents the most extensive congressional assault on the gradually eroding fortress of the American Rule since the Supreme Court's seminal decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).[7] Like many of its more specific statutory predecessors,[8] the EAJA rejects the traditional American Rule, which generally prohibits fee-shifting unless the suit was prosecuted in bad faith by the losing party, and moves toward the central premise of the English Rule that fee awards are "a proper allocation of the costs of the litigation and a measure that lifts the cost deterrent facing the successful litigant." *S&H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Commission*, (5th Cir. 1982) 672 F.2d 426.[9] In an effort to alleviate the economic burdens faced by those who would challenge unreasonable government action, Congress made two significant changes in prior law. First, Congress codified existing common law exceptions to the American rule by specifically authorizing the courts to award fees and other expenses to prevailing parties in civil litigation involving the United States, to the same extent that fees and expenses can be awarded against private parties. 28 U.S.C.S. § 2412(b). The effect of this modification is to make the United States potentially liable for fees under the "bad faith", "common fund" and "common benefit" exceptions to the American rule.[10]

In a second major departure from the American rule, Congress established a general, nondiscretionary fee-shifting provision which enhances the prospects of certain parties who have prevailed in civil litigation with the United States to recover fees from the Government:[11]

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addi-

---

**6.** The EAJA has a "sunset" provision repealing the law on October 1, 1984. 28 U.S.C.S. § 2412 note; P. L. 96–481, Title II, § 204(c), 94 Stat. 2329 (1980).

**7.** The *Alyeska* decision had limited the inherent power of courts to award attorneys' fees to prevailing parties, requiring that such awards be rooted in common law exceptions to the American Rule or in specific statutory authorization.

**8.** Among the more recent federal fee-shifting statutes are Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b), 2000e–5(k); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3612(c); the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E); the Voting Rights Act of 1965, as amended, 42 U.S.C. § 19731(e); and the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988.

**9.** The exception created by S.265 focuses primarily on those individuals for whom cost may be a deterrent to vindicating their rights. The bill rests on the premise that a party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy. An adjudication or civil action provides a concrete, adversarial test of Government regulation and thereby insures the legitimacy and fairness of the law .... The bill thus recognizes that the expense of correcting error on the part of the Government should not rest wholly on the party whose willingness to litigate or adjudicate has helped to define the limits of Federal authority. Where parties are serving a public purpose, it is unfair to ask them to finance through their tax dollars unreasonable Government action and also bear the costs of vindicating their rights. H.R. Rep. No. 1418, 96th Cong., 2d Sess. 10 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad. News 4984, 4988–89.

**10.** There appears to be no justification for exempting the United States in these situations; the change simply reflects the belief that, at a minimum, the United States should be held to the same standards in litigating as private parties. As such, it is consistent with the history of § 2412 which reflects a strong movement by Congress toward placing the Federal Government and civil litigants on a completely equal footing. H.R.Rep. No. 96–1418, *supra*, at 9, 1980 U.S. Code Cong. & Ad. News at 4987.

**11.** The Act defines "party" as an individual with a net worth of $1,000,000 or less, a company with a net worth of $5,000,000 or less, or a company with no more than 500 employees. 28 U.S.C.S. § 2412(d)(2)(B). Plaintiffs clearly qualify as eligible parties under the statute. "United States" is defined to include federal agencies and officers. 28 U.S.C.S. § 2412(d)(2)(C). The NLRB obviously meets this definition.

tion to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C.S. § 2412(d)(1)(A).[12] It is important to recognize that this subsection, which provides the basis for plaintiffs' claim for attorneys' fees in this action, does not automatically require the Government to compensate all prevailing parties for fees and expenses. Instead, it adopts a compromise position, embodied in the standard of "substantial justification", which "balances the constitutional obligation of the executive branch to see that the laws are faithfully executed against the public interest in encouraging parties to vindicate their rights." H.R. Rep. No. 1418, *supra,* at 10, 1980 U.S. Code Cong. & Ad. News at 4989. In particular, Congress rejected the liberal standard of recovery under the civil rights statutes which generally entitles prevailing plaintiffs to receive an award of attorneys' fees unless special circumstances would render an award unjust. *See Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). At the same time, however, Congress rejected a standard proposed by the Department of Justice which would have authorized recovery of fees and expenses against the Government only if a prevailing party could prove that the Government's position was arbitrary, frivolous, unreasonable, or groundless. H.R. Rep. No. 1418, *supra,* at 10, 14, 1980 U.S. Code Cong. & Ad. News at 4989, 4992–93.[13] Such a restrictive approach, Congress reasoned, would maintain significant barriers to recovery of fees by prevailing litigants and would not appreciably diminish existing deterrents created by the high cost of vindicating legal rights in the face of arbitrary and unreasonable government action. *Id.*

The standard of recovery that ultimately emerged in section 2412(d)(1)(A) represents a "middle ground" between an automatic award of fees to a prevailing party engaged in litigation with the United States and the standard proposed by the Department of Justice. Although the EAJA is silent on the meaning of the "substantially justified" standard, the House Report contains an instructive passage:

> The test of whether or not a Government action is substantially justified is essentially one of reasonableness. Where the Government can show that its case had a reasonable basis both in law and fact, no award will be made. In this regard, the strong deterrents to contesting Government action require that the burden of proof rest with the Government. This allocation of the burden, in fact, reflects a general tendency to place the burden of proof on the party who has readier access to and knowledge of the facts in question. The committee believes that it is far easier for the Government, which has control of the evidence, to prove the reasonableness of its action than it is for a private party to marshal the facts to prove that the Government was unreasonable.
>
> . . . .
>
> The standard, however, should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing.

---

**12.** An analogous provision, 5 U.S.C.S. § 504(a)(1), affords a similar entitlement to attorneys' fees and expenses to prevailing parties in *adversary* adjudications at the federal agency level. That provision has no applicability here.

**13.** In other words, Congress refused to adopt the standard governing fee awards *against* plaintiffs in Title VII cases, where to avoid an award of attorneys' fees a plaintiff need only establish that his lawsuit was nonfrivolous. *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 420–21, 98 S.Ct. 694, 699–700, 54 L.Ed.2d 648 (1978).

**262**

H.R. Rep. No. 1418, *supra,* at 10–11, 1980 U.S. Code Cong. & Ad. News at 4989–90; *see also* S. Rep. No. 253, 96th Cong., 2d Sess. 6–7 (1980).

█ In light of this congressional explanation of the governing standard for recovery of attorneys' fees under the EAJA, it appears that the NLRB retains the burden of demonstrating that its position in this dispute was legally and factually reasonable. After carefully considering the extensive memoranda filed by the parties on this question and the oral arguments of counsel, the Court is of the opinion that the Board has satisfied its statutory burden. Since there was a reasonable basis in law and fact for the Board's position at the administrative and judicial stages of this controversy,[14] the Court finds it unnecessary to address the alternative arguments raised by the Board in opposition to plaintiffs' application for costs and fees. A genuine jurisdictional dispute existed between the parties, and the Board has carried its burden of showing a reasonable basis in law and in fact for its litigation posture.

### 1. *The NLRB's Initial Refusal To Grant Plaintiffs' Decertification Petition*

Section 9(c)(1) of the NLRA, 29 U.S.C. § 159(c)(1), accords the Board full authority to determine whether a petition for a representation election filed by an employer, a labor organization or a group of employees raises a sufficient "question of representation affecting commerce" to justify a formal representation election. If the Board decides that a substantial question of representation exists, it is required to direct an election by secret ballot in an appropriate bargaining unit designed "to assure to employees the fullest freedom in exercising the rights guaranteed by [the NLRA] ...." 29 U.S.C. § 159(b). One of the most significant limitations on the Board's discretionary authority to determine and recognize bargaining units as a prelude to representation elections is contained in section 9(b)(1), which prohibits the Board from deciding that any unit is appropriate "if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit ...."[15] 29 U.S.C. § 159(b)(1).

Although both the language and the legislative history of section 9(b)(1) indicate that professional employees are entitled to vote separately on whether or not they desire to be included in a mixed bargaining unit of professional and non-professional employees, the Board initially denied plaintiffs' petition for a separate decertification election without determining whether they

---

14. There appears to be some dispute over whether the "position" requiring substantial justification refers to the litigation posture of the United States or to the substantive position that generated the civil action. *See Alspach v. District Director of Internal Revenue,* 527 F.Supp. 225, 228 (D.Md.1981) (statute refers to the Government's actions or position in prosecuting or defending litigation, not to its actions upon which suit is based). *Contra, Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348 at 352–353 (D.D.C.1982); *Constantino v. United States,* No–81–1571, slip. op. at 4 (E.D.Pa. Dec. 2, 1981) (court must scrutinize not only the Government's theory in defending against litigation, but also the actions and positions that caused plaintiff to bring the lawsuit). Although the latter view seems to be more consistent with the remedial objectives of the EAJA, the Court finds that the NLRB's reason for rejecting the first decertification petition and its jurisdictional argument in this litigation were both substantially justified within the meaning of the Act.

15. Section 2(12) of the NLRA, 29 U.S.C. § 152(12), defines "professional employee" as follows:

(a) any employee engaged in work (i) predominately intellectual and varied in character as opposed to routine mental, manual, mechanical or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes.

qualified as "professional employees" because the proposed decertifying unit of one hundred engineers was not coextensive with the employer unit that had been recognized since 1938. *See* Supplemental Memorandum In Support Of The National Labor Relations Board's Opposition To Plaintiffs' Motion For Costs And Attorney Fees, at 9. The Board reasoned that the Supreme Court's reference to section 9(b)(1) as a "clear and mandatory" provision, *see Leedom v. Kyne,* 358 U.S. at 188–89, 79 S.Ct. at 183–84, was not designed to afford professional employees a vested right to disrupt an *existing* bargaining relationship for the *sole* purpose of being unrepresented. Memorandum In Support Of The National Labor Relations Board's Opposition To Plaintiffs' Motion For Costs And Attorney Fees, at 2 n. 1. Neither was the *Kyne* decision intended to divest the Board of the traditional discretion that it exercised in the context of representation proceedings to properly balance the twin statutory goals of promoting freedom of choice in the workplace and maintaining stable bargaining relationships. *See* 29 U.S.C. § 151 (1976). Thus, the Board concluded that while it would continue to order a separate election for professionals as a precondition to recognizing any *new* bargaining unit composed of both professional and non-professional employees, it would not utilize the section 9(b)(1) proviso as a weapon to fracture *existing* representational units.

The Board's practice of ordinarily refusing to direct a decertification election in a unit that is not coextensive with an existing bargaining unit can be traced to its seminal decision in *Westinghouse Electric Corporation,* 115 NLRB 530 (1956), which relied upon statutory interpretation and policy considerations in dismissing a petition to decertify an incumbent union from representing the professional employees in an established bargaining unit that included both professional and non-professional employees. In *Westinghouse* the Board concluded that section 9(c)(1)(A) of the NLRA did not require it "to conduct a decertification election on the basis of a petition which seeks to raise a question concerning representation with respect to only part of an existing unit." *Id.* at 532. Rather, the section was designed solely "to provide a method for determining whether an existing unit of employees desire to continue their *current* representation . . . ." *Id.* At the same time, the Board interpreted section 9(b)(1) as mandating a separate representation election for professional employees only when an election was being simultaneously sought in a mixed unit composed of both professionals and non-professionals. By contrast, the representation petition filed in *Westinghouse,* no less than the petition that plaintiffs filed with the Board's Regional Office prior to the commencement of this action, sought to decertify an *incumbent* union and preclude it from representing only the professional employees in a mixed bargaining unit that has been firmly established for over forty years. On the basis of that distinction, the Board concluded that "no statutory mandate requires the Board to direct a decertification election in only a segment of an existing unit, even though the employees in that segment are professional employees." *Id.*

Finally, the Board's refusal to authorize a partial decertification election in *Westinghouse* was based on its considered view of appropriate national labor policy. Thus, the Board reasoned that "although the desirability of according specialized representation to specialized groups of employees is sufficient to warrant disrupting an existing relationship when separate representation is sought, such considerations are not operative in a decertification proceeding which does not result in separate *representation* for purposes of collective bargaining." *Id.* at 533. *See also Campbell Soup Company,* 111 NLRB 234 (1955) (same practice followed for craft severance questions under section 9(b)(2)).

While the Court does not necessarily accept the Board's view of the limits of section 9(b)(1) and the appropriate balance between the specialized needs of professional employees and the continued viability of

existing bargaining units,[16] it is convinced that there was at least a reasonable basis for the Board's initial decision to follow its consistent interpretation of statutory and policy requirements [17] in denying plaintiffs' decertification petition. In this case, a group of engineers requested a decertification election encompassing only the professional component of a mixed bargaining unit that had been operative for over forty years. The Board denied the petition on the basis of its established rule that decertification elections are appropriate only in a unit that is coextensive with the previously recognized or certified unit.[18] Despite plaintiffs' contention that the Board's "pro-unionism stance eviscerates the meaning of free choice embodied in section 7 of the NLRA,"[19] there is nothing in the challenged practice which prohibits professional employees in an established mixed unit from exercising their right of self-determination, even at the expense of bargaining stability, in an appropriate *representation* proceeding.[20] Whether the Board's distinction between *representation* petitions brought by professionals in a mixed unit and *decertification* petitions brought by those same individuals merits judicial approval in light of the language of section 9(b)(1) is not determinative here; the only relevant point is that the position adopted by the Board has a reasonable basis in law and in fact.

It is generally conceded that the effective administration of our national labor laws requires the Board to exercise a more pronounced policymaking function than a court would ordinarily exercise in demarcating legal rights through concrete adversary adjudications. That the Board has chosen to develop rules and practices governing labor relations through adjudicative rather than rulemaking proceedings cannot obscure the fact that Congress has entrusted the Board with a significant residuum of discretion to formulate national labor policy within the broad interstices of the statute. One need not pejoratively characterize the Board as a politically pliable agency to recognize that existing Board precedent is inevitably, and necessarily, subject to some modification as the composition of the Board changes in response to electoral developments. A new national administration may have a decidedly different view of the appropriate balance between the statutory values of free choice and bargaining stability than its immediate predecessor, and the composition of the Board may ultimately tend to reflect

16. In any event, the Court is barred by constitutional limitations from expressing either agreement or disagreement with the challenged practice.

17. *See, e.g., Westinghouse Electric Corporation,* 111 NLRB 497 (1955); *S.S. White Dental Mfg. Co.,* 109 NLRB 1117 (1954); *Union Switch & Signal Co.,* 76 NLRB 205 (1948) (Board will grant professional employees a separate 9(b)(1) vote on RC-petition of *rival union* seeking to sever professionals from established mixed unit). *See also Westinghouse Electric Corporation,* 129 NLRB 846 (1960); *Westinghouse Electric Corporation,* 116 NLRB 1545 (1956) (Board will grant professional employees a separate 9(b)(1) vote on RM-petition of either an employer or a union seeking a representation election in a proposed mixed unit).

18. The fact that the inclusion of the engineers in a mixed unit preceded the enactment of section 9(b)(1) is not dispositive, for the Board's disapproval of partial decertification has applied not only to mixed units that have been certified by the Board after a section 9(b)(1) vote, but also to units in which professionals have been included voluntarily by an employer and union for an extended period of time. *See Great Falls Employers Council, Inc.,* 114 NLRB 370 (1955) (mixed unit recognized by employer for some time). In both cases, the Board has determined that the important statutory policy of maintaining stable bargaining relationships—a policy not present in *Leedom v. Kyne*—prohibits professional employees from fracturing an established bargaining unit solely for the purpose of being unrepresented. *Westinghouse Electric Corporation,* 115 NLRB at 533.

19. Reply Brief Of Plaintiffs In Support Of Their Application Under The Equal Access To Justice Act, at 13.

20. *See ITT Corporation,* 159 NLRB 1757, 1759–64 (1966), enf'd, 382 F.2d 366, 370 (3d Cir. 1967), *cert. denied,* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968)(Professionals in mixed bargaining unit not foreclosed from pursuing self-determination "at an appropriate time and in an appropriate proceeding," despite long bargaining history in a mixed unit).

that view. Ironclad adherence to the doctrine of *stare decisis* in all adjudicatory proceedings before the Board would severely inhibit the salutary efforts of a reconstituted Board to modify existing rules and practices in the face of changing national perceptions *and* the Board's own evolving experience with the actual effects of those rules and practices.

Largely for these reasons, the Court does not believe that the Board's subsequent decision in a *second* decertification proceeding to afford plaintiffs a separate election on the appropriateness of the mixed bargaining unit at Utah Power & Light Company makes the theory underlying the Board's denial of the initial decertification petition unreasonable and unjustified. In granting plaintiffs' second decertification petition, the Board reaffirmed the policies underlying *Westinghouse Electric Corporation* and specifically stated that it generally would continue to require that the unit for decertification be coextensive with the existing unit. However, in light of "this unique situation" in which the professional employees seeking decertification had never had an opportunity to vote in a self-determination election,[21] the Board decided to exercise its considerable discretion and make an exception to the principle that had motivated its denial of plaintiffs' first decertification petition. This change of position is nothing more than a modification of a uniform rule in the face of extenuating circumstances. It hardly constitutes a *de facto* admission that the Board's initial disapproval of the decertification petition violated a "clear and mandatory" provision of the NLRA sufficient to create jurisdiction in this Court; neither does it indicate that a genuine dispute did not exist in the first decertification proceeding over the appropriateness of disrupting a stable bargaining relationship that had endured for over forty years. An award of attorneys' fees in this case would simply not "account for the reasonable and legitimate exercise of [discretionary] func-

tions"[22] by the NLRB; its position, however problematical on the merits, was substantially justified within the meaning of the EAJA.

2. *The "Bad Faith" Exception*

 Although 28 U.S.C.S. § 2412(b) authorizes an award of attorneys' fees against the United States under the so-called "bad faith" exception to the American Rule, the Court finds no basis for any contention that the Board acted in bad faith, vexatiously, wantonly, or for oppressive reasons at either the agency or the judicial level. Accordingly, plaintiffs are not entitled to an award of fees under this subsection.

An Order consistent with this Memorandum Opinion has been issued.

---

21. The reason, of course, is that the mixed unit had been certified by the Board as a result of voluntary recognition by the employer long before section 9(b)(1) was adopted by Congress.

22. H.R.Rep. No. 1418, *supra,* at 14, 1980 U.S. Code Cong. & Ad. News at 4992.