631 F.2d 802
 203 U.S.App.D.C. 220
 ARIZONA ELECTRIC POWER COOPERATIVE, INC., et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Southern Union Gas Co., Southern California Gas Co., El Paso
Natural Gas Co., Pacific Gas & Electric Co., People of the
State of California and the Public Utilities Commission of
the State of California, Intervenors.
ARIZONA ELECTRIC POWER COOPERATIVE, INC. and City of
Willcox, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Asarco, Inc., et al., Southern Union Company, People of the
State of California, et al., General Motors Corporation,
Pacific Gas & Electric Company, Tucson Gas & Electric
Company, Southwest Gas Corporation, Southern California Gas
Company, Arizona Public Service Company, San Diego Gas &
Electric Company, El Paso Natural Gas Company, Southern
California Edison Company, Intervenors.
SOUTHERN CALIFORNIA GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Southern Union Co., People of the State of California,
Public Utilities Commission of the State of California,
General Motors Corporation, Pacific Gas and Electric Co.,
Tucson Gas & Electric Co., Arizona Public Service Co., San
Diego Gas & Electric Co., El Paso Natural Gas Co., Southern
California Edison Co., Arizona Electric Power Coop., City of
Willcox, Intervenors.
ARIZONA ELECTRIC POWER COOPERATIVE, INC. and the City of
Willcox, Arizona,Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Southern California Gas Company, Pacific Gas and Electric
Company, El Paso Natural Gas Company, Intervenors.
SOUTHERN UNION COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
State of California, et al., General Motors Corp., Pacific
Gas and Electric Co., Tucson Gas and Electric Co., Southern
California Gas Co., Arizona Public Service Co., San Diego
Gas & Electric Co., El Paso Natural Gas Co., Arizona
Electric Power Coop., Inc., et al., Salt River Project
Agricultural Improvement and Power District, Southwest Gas
Corp., Southern California Edison Co., Intervenors.
PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Arizona Electric Power Cooperative, Inc., San Diego Gas &
Electric Co., The People of the State of California and the
Public Utilities Commission of California, General Motors
Corporation, El Paso Natural Gas Company, Southern Union
Company, Southwest Gas Corp., Intervenors.
ARIZONA ELECTRIC POWER COOPERATIVE, INC. and the City of
Willcox, Arizona, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Southern California Gas Co., Southwest Gas Corp., Pacific
Gas and Electric Co., Salt River Project Agricultural
Improvement and Power District, El Paso Natural Gas Co.,
Southern Union Co., General Motors Corporation, Intervenors.
ARIZONA ELECTRIC POWER COOPERATIVE, INC. and the City of
Willcox, Arizona, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Pacific Gas and Electric Company, People of the State of
California, Public Utilities Commission of the State of
California, Arizona Public Service Company, Southern
California Gas Company, El Paso Natural Gas Company, Intervenors.
 Nos. 75-1952, 77-1634, 77-1676, 79-1681, 77-1715, 77-1830,
78-1198 and 79-2087.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 30, 1980.
Decided May 22, 1980.
Rehearing Denied Aug. 13, 1980.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 Arnold D. Berkeley, Washington, D. C., with whom Roger J. McClure and Bruce J. Wendel, Washington, D. C., were on brief, for Arizona Electric Power Cooperative, et al., petitioners in Nos. 75-1952, 77-1634, 78-1198, 79-1681 and 79-2087 and intervenors in Nos. 77-1676, 77-1715 and 77-1830.
 John S. Fick, Los Angeles, Cal., with whom Thomas D. Clarke, Los Angeles, Cal., was on brief, for Southern California Gas Company, petitioner in No. 77-1676 and intervenor in Nos. 75-1952, 77-1634, 77-1715, 78-1198 and 79-1681. Douglas Kent Porter and Jeffrey A. Meith, Los Angeles, Cal., also entered an appearance for Southern California Gas Co.
 Robert B. McLennan, San Francisco, Cal., with whom Malcolm H. Furbush, San Francisco, Cal., was on brief, for Pacific Gas Electric Co., petitioner in No. 77-1830 and intervenor in Nos. 75-1952, 77-1634, 77-1676, 77-1715, 78-1198, 79-1681 and 79-2087. Howard v. Golub, San Francisco, Cal., also entered an appearance for Pacific Gas and Electric Co.
 George H. Williams, Jr., Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent. Drexel D. Journey, Robert W. Perdue, Allan A. Tuttle, Thomas M. Walsh, M. Frazier King, Jr., and Howard E. Shapiro, Attys., Federal Energy Regulatory Commission, Washington, D. C., also entered appearances for respondent.
 
 
 1
 C. Frank Reifsynder, Washington, D. C., for El Paso Natural Gas Co., intervenor in Nos. 75-1952, 77-1634, 77-1676, 77-1715, 77-1830, 78-1198, 79-1681 and 79-2087. George W. Wise, Washington, D. C., also entered an appearance for El Paso Natural Gas Co.
 
 
 2
 Nicholas W. Fels, Washington, D. C., with whom Terry Coleman, Washington, D. C., were on brief, for Asarco, Inc., et al., intervenor in No. 77-1634.
 
 
 3
 Robert J. Haggerty, Washington, D. C., also entered an appearance for Southern Union Gas Company, petitioner in No. 77-1715 and intervenor in Nos. 75-1952, 77-1634, 77-1676, 77-1830 and 78-1198.
 
 
 4
 J. Calvin Simpson, Randolph W. Deutsch and Lawrence Q. Garcia, San Francisco, Cal., also entered an appearance for People of the State of California, et al., intervenor in Nos. 75-1952, 77-1634, 77-1676, 77-1715, 77-1830 and 79-2087.
 
 
 5
 Edward J. Grenier, Jr., Richard P. Noland, Floyd I. Robinson, William H. Penniman, Washington, D. C., and Julius Jay Hollis, Detroit, Mich., also entered an appearance for General Motors Corp., intervenor in Nos. 77-1634, 77-1676, 77-1715, 77-1830 and 78-1198.
 
 
 6
 Thomas F. Brosnan, John F. Harrington, Washington, D. C., and Lawrence V. Robertson, Tucson, Ariz., also entered an appearance for Tucson Gas & Electric Co., intervenor in Nos. 77-1634, 77-1676 and 77-1715.
 
 
 7
 C. H. McCrea, Las Vegas, Nev., also entered an appearance for Southwest Gas Corp., intervenor in Nos. 77-1634, 77-1715 and 77-1830.
 
 
 8
 Peyton G. Bowman, III and C. Floyd Mathews, Washington, D. C., also entered appearances for Arizona Public Service Co., intervenor in Nos. 77-1634, 77-1676, 77-1715 and 79-2087.
 
 
 9
 C. Hayden Ames, David R. Pigott, San Francisco, Cal., also entered appearances for San Diego Gas and Electric Co., intervenor in Nos. 77-1634, 77-1676, 77-1715 and 77-1830.
 
 
 10
 Rollin E. Woodbury, H. Robert Barnes, and Alan M. Nedry, Rosemead, Cal., also entered appearances for Southern California Edison Co., intervenor in Nos. 77-1634, 77-1676 and 77-1715.
 
 
 11
 Joel L. Greene, Washington, D. C., and Richard H. Silverman, Phoenix, Ariz., also entered appearances for Salt River Project Agricultural Improvement and Power District, intervenor in Nos. 77-1715 and 78-1198.
 
 
 12
 Before BAZELON, Senior Circuit Judge, and WALD and EDWARDS, Circuit Judges.
 
 Opinion PER CURIAM
 PER CURIAM:
 
 13
 In these consolidated appeals, we are called upon to review several orders of the Federal Energy Regulatory Commission ("the Commission") issued in response to the continuing shortage of natural gas.[1] The controversy arises out of the efforts of the Commission and the El Paso Natural Gas Company ("El Paso") to assure adequate supplies of gas to east of California ("EOC") customers who receive natural gas from El Paso. Petitioners Arizona Electric Power Cooperative, Inc. and the City of Willcox, Arizona (collectively "AEPCO"), Southern California Gas Company ("So Cal"), and Pacific Gas and Electric Company ("PG&E") challenge the Commission's orders on various substantive and procedural grounds. We find all but one of petitioners' contentions moot, and therefore dismiss the petitions in Nos. 75-1952, 77-1634, 77-1676, and 77-1830. In the remaining case, No. 78-1198, we affirm the Commission.
 
 I. BACKGROUND
 
 14
 El Paso is an interstate natural gas transmission company serving direct and distributor customers in California and in five southwestern states east of California. The petitioners in this case are all El Paso customers. In 1971, the Commission ordered El Paso and other pipelines to establish curtailment plans in anticipation of impending natural gas shortages. In response, El Paso designed and eventually began operating under a plan which prioritized different end uses of gas into five categories.[2] Priorities 1 and 2 (P-1 and P-2) the highest priorities consist of residential uses and commercial uses which cannot be supplied by resort to alternative fuels. Priorities 4 and 5 (P-4 and P-5) the lowest priority uses involve the use of natural gas as boiler fuel, a use for which substitute products are available. Priority 3 is defined residually as those end uses not included within Priorities 1, 2, 4, and 5.
 
 
 15
 Under the curtailment plan, El Paso's customers report their different end use needs by priority to the pipeline each day. El Paso then fills all the P-1 needs, followed by P-2 needs, P-3 needs, and so on until all of its available gas supply for that day is exhausted. If its supplies run out before low priority customers have been fully serviced, those customers must resort to alternative fuels for that day.
 
 
 16
 While curtailment plans provide for the orderly distribution of gas during times of shortage, they are not alone a means of avoiding any shortage. Accordingly, in 1971 the Commission also ordered El Paso to develop a plan for husbanding gas in the summer, when it is in relatively low demand, for use in the winter by temperature sensitive high priority customers. In compliance with this request, El Paso successfully petitioned the Commission in 1973 for permission to reactivate the Rhodes storage field in New Mexico. The Commission's order, which was unopposed, authorized El Paso to curtail its EOC P-5 customers so that it could inject up to 16 billion cubic feet (Bcf) of gas into the Rhodes field.
 
 
 17
 By May of 1974, El Paso became concerned that Rhodes storage would not be sufficient to assure adequate winter gas supplies for all of its EOC high priority customers. Since there were no other EOC storage facilities available, El Paso contacted its two California customers, petitioners PG&E and SoCal, and negotiated two separate agreements known as the "load equation" agreements. In the first of these contracts, El Paso agreed to increase PG& E's summer deliveries with gas made available by curtailing EOC P-5 customers. PG&E, which had substantial unused storage capacity, would then store this extra gas throughout the winter. If the gas was needed to meet shortages in EOC high priority supplies it would be "returned" by diverting PG&E scheduled deliveries to the EOC market. PG&E would then draw from the stored gas to meet its needs.
 
 
 18
 El Paso's agreement with SoCal called for "back-off" rights. Under this arrangement, SoCal agreed to accept reduced deliveries at any point during the winter when shortages of gas for EOC high priority customers would require curtailment. Any gas thus diverted from SoCal would later be repaid by curtailing El Paso's lower priority EOC customers. During the interim, SoCal would draw on its substantial storage capacity for its requirements.
 
 
 19
 On May 13, 1974, El Paso applied to the Commission for temporary and permanent certificates authorizing the load equation agreements. The Commission granted a temporary certificate on June 21, 1974, authorizing load equation for the 1974-75 winter, but withholding permanent certification pending hearings.[3] Pursuant to the temporary certificate, El Paso made advance sales to PG&E of approximately 13 Bcf of gas. The following summer, in anticipation of more winter shortages, El Paso again sought temporary and permanent certificates, this time authorizing an extension of load equation for another two years. By order issued July 9, 1975, the Commission granted the temporary certificate, but once again declined to issue a permanent certificate without public hearings.[4]
 
 
 20
 Public hearings were then held before an administrative law judge, who, on June 7, 1976, issued an initial decision denying permanent certification.[5] In all but one respect, the ALJ was favorable towards El Paso's request. But the ALJ accepted AEPCO's contention that there would have been no need for load equation but for an illegal act, viz., a misclassification of California customer storage injection needs in the high priority 2. (This misclassification is the subject of the court's opinion in Arizona Electric Power Cooperative, Inc., et al. v. FERC (the "Storage Injection" cases), Nos. 77-1754 et al., --- U.S.App.D.C. ----, 631 F.2d 811 (D.C.Cir. May 22, 1980).) Based on this finding of illegality, the ALJ recommended that El Paso be denied its permanent certificate.
 
 
 21
 On review, the full Commission reversed and ordered permanent certification with some modifications and conditions.[6] In a nutshell, the Commission held that the cause of a shortage does not diminish the fact that a shortage exists. The public convenience and necessity according to the best available evidence, said the Commission, still required load equation, lest serious winter shortages necessitate curtailing EOC P-1 and P-2 customers.
 
 
 22
 The Commission did find, however, that the El Paso plan had a discriminatory feature. It required all of the storage gas to be secured by curtailing only EOC P-5 customers, not P-5 customers in both California and the EOC states. The Commission found this feature to constitute undue discrimination between pipeline customers, and ordered El Paso, as a condition to the permanent certificate, to reallocate deliveries between the California and EOC P-5 customers so that the California customers would contribute their pro rata share to the storage arrangements. El Paso was given substantial discretion in designing an appropriate payback plan.[7]
 
 
 23
 On August 19, 1977, El Paso's proposed payback plan was submitted to the Commission. It was approved with modifications in Opinion 800-B, issued on December 30, 1977.[8] The plan, as approved, called for the return to EOC P-5 customers of (1) all the gas predelivered to PG&E under load equation, and (2) the California pro rata share of the Rhodes storage and SoCal "backoff" gas. This return of gas was to be achieved by curtailing California low priority customers, and diverting the gas thus made available to the EOC P-5's. The "restitution" gas, as the Commission called it, would be purchased by El Paso at current (1978) prices, and sold to the EOC P-5's at 1978 prices. The plan also provided that the load equation agreements would be allowed to expire. Thus, as of April 1979, all the gas had been returned and the load equation agreements had expired.
 
 
 24
 II. AEPCO'S CHALLENGE TO THE CERTIFICATION OF LOAD EQUATION
 
 
 25
 (Nos. 75-1952 and 77-1634)
 
 
 26
 Initially, AEPCO renews its challenge to the propriety of the temporary and permanent certification of the load equation agreements. They argue, inter alia, that the Commission acted without substantial evidence of an impending shortage, and that in any event, any need there might have been for the storage arrangements was caused solely by El Paso's illegal deliveries of storage injection gas to its California customers under Priority 2. We find it unnecessary to address these claims, however, for AEPCO's claims have been rendered moot by the termination of the load equation agreements and return of the gas.
 
 
 27
 The doctrine of mootness requires courts to dismiss cases where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Where "interim relief or events have completely and irrevocably eradicated the effects of (an) alleged violation" of law, a case is moot. County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). In other words, when a party has already been made whole for damage it claims to have suffered, the case is ordinarily moot. See Alton & Southern Railway Co. v. International Association of Machinists & Aerospace Workers, 463 F.2d 872, 877, 879-80 (D.C.Cir. 1972).
 
 
 28
 The only damage AEPCO claims to have suffered as a result of the Commission's orders certifying the load equation agreements is the gas it lost as an EOC P-5 customer when El Paso diverted gas for storage in California. But all of that gas has now been returned to AEPCO pursuant to the Commission's conditions to the permanent certificate and the settlement approved in Opinion 800-B. Further, the load equation agreements have now expired, and can no longer harm AEPCO. Since AEPCO has been unable to identify any other relief which this court or the Commission could give to it by vacating the orders granting the temporary and permanent certificates,[9] the petition in Nos. 75-1952 and 77-1634 are dismissed as moot.
 
 
 29
 III. AEPCO's CHALLENGE TO THE PRICE OF THE RESTITUTION GAS
 
 
 30
 (No. 78-1198)
 
 
 31
 AEPCO's principal grievance does not go so much to the amount of gas which was returned to it and other EOC P-5 customers, as to the price which it had to pay for the gas. In its settlement plan, El Paso proposed, and the Commission agreed, that the gas should be returned at then current 1978 prices, rather than the lower 1974 prices in effect at the time the gas was diverted from the EOC P-5 customers. AEPCO mounts three basic challenges to the Commission's approval of the use of 1978, rather than 1974, prices: (1) the gas returned in 1978 was the same gas diverted in 1974, and should therefore be returned at the same price; (2) AEPCO was merely a victim of El Paso's illegal conduct, and should not be required to suffer severe financial penalty as a result; and (3) the Commission's order results in a windfall to El Paso. We find none of these contentions persuasive, and therefore we affirm the Commission.
 
 
 32
 We note preliminarily the court's narrow scope of review over decisions such as the Commission has had to make in this case. It is an unfortunate reality that a natural gas shortage exists and as a result, the public interest in maintaining adequate supplies occasionally requires some measure of sacrifice by the companies involved in the distribution and use of natural gas. However unpleasant that may be, it is inevitable, and as the Third Circuit has observed, "(n)ot all parties injured as a result of the . . . natural gas crisis can be made whole." Hercules, Inc. v. FPC, 552 F.2d 74, 89 (3rd Cir. 1977). The difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion. Accordingly, it is not the role of the courts to second guess the Commission's judgment because we think we could devise a better solution than that which the agency has adopted so long as the agency's determination has a rational basis. Gulf Oil Corp. v. FPC, 563 F.2d 588, 608 (3rd Cir. 1977). We find such a rational basis in the orders presently under review.
 
 
 33
 In determining the price of the restitution volumes, the Commission, as it must, looked not only to the private interests at stake, but also to the broader public interest. It concluded that El Paso's load equation proposals had "served a valuable public service" by assuring adequate winter gas supplies to EOC high priority customers,[10] a conclusion we concur in. Moreover, the Commission noted that restitution would be made "with gas supplies currently purchased by El Paso from its suppliers at currently effective rates,"[11] not the lower 1974 rates. Therefore, if El Paso was required to sell the gas to AEPCO at 1974 rates, "a substantial dollar injury would be imposed upon El Paso for providing the protection afforded by load equation. . . ."[12] We agree with the Commission that in the circumstances of this case, any such penalty would be inequitable. Also, as the Commission found, the penalty would act "as an industry-wide deterrent against taking emergency actions to protect service on the authority of a temporary certificate,"[13] a result plainly contrary to the public interest.
 
 
 34
 The Commission also considered, and in our view properly rejected AEPCO's contention that it will suffer undue hardship if it is required to pay 1978 prices. On the contrary, AEPCO's surplus of natural gas during the period of restitution has allowed it to avoid resorting to expensive alternative fuels. Thus any injury it might have suffered due to the discriminatory diversions of gas in 1974 and 1975 has been offset by its more recent savings. Further, under the settlement plan approved by the Commission, AEPCO not only received California's pro rata share of the load equation gas, the amount it claimed it was entitled to, it received all of the gas diverted from it for storage with PG&E. In this respect, AEPCO got more gas under the termination of load equation than it would have gotten had load equation been implemented without any discriminatory features. The Commission properly took these factors in to account in concluding that the restitution volumes should be priced at 1978 rates.
 
 
 35
 Finally, AEPCO's principal claim that the volumes returned in 1978 were the same volumes of gas diverted from AEPCO in 1974, and should therefore be priced at 1974 rates cannot withstand scrutiny. Indeed, as the Commission noted, "AEPCO's theory . . . bears no relationship to reality."[14] Under the load equation agreement, all of the load equation gas was sold to PG&E. Title in the gas passed to PG&E, including the right to use it as PG&E might please. Although PG&E remained contractually bound to "return" gas to El Paso in the event of an EOC shortage, this return would be accomplished by curtailing future deliveries to PG&E and using new gas to supply EOC high priority customers. In the meantime, PG&E could draw on its storage capacity to meet its local needs. No part of this arrangement is dependent on the storage of any particular volumes any particular molecules of gas, no gas was physically returned from PG&E to EOC customers, and all the gas delivered to EOC customers at all times was new gas purchased by El Paso at prices current at the time of the sale. We therefore reject AEPCO's claim that the restitution gas must be returned at 1974 prices, and we affirm the Commission's decision as a reasonable solution to a difficult problem.
 
 IV. SOCAL AND PG&E'S CLAIMS
 
 36
 In No. 77-1676, SoCal challenges the conditions which the Commission saw fit to impose in the permanent certificate authorizing load equation. SoCal has indicated in its brief, however, that if the Commission is affirmed as to the pricing of the restitution gas, it will withdraw its appeal in the spirit of settlement. We believe this is a proper and commendable resolution to this controversy, and therefore, in light of our affirmance of the Commission in No. 78-1198, we dismiss the petition in No. 77-1676 as moot. Similarly, we dismiss PG&E's petition, No. 77-1830, as moot. PG&E argued that the Commission erred by refusing to consider the utility's status as a "partial requirements" customer in conditioning the permanent certificate. In its brief and at oral argument, however, PG&E has informed the court that the Commission has now provided a forum for this argument in another ongoing proceeding. PG&E has therefore suggested that the case is moot, and we dismiss it on their suggestion.
 
 V. CONCLUSION
 
 37
 In summary, we hold that AEPCO's petitions for review of the Commission's orders certifying load equation have been rendered moot, and therefore dismiss the petitions in Nos. 75-1952 and 77-1634. We affirm the Commission's determination that the load equation payback should be priced at 1978 rates, No. 78-1198. Finally, we dismiss SoCal and PG&E's petitions, Nos. 77-1676 and 77-1830, respectively, in accordance with the wishes of the petitioners.
 
 
 38
 So ordered.
 
 
 
 [1]
 Since the filing of notice of appeal, however, three of these appeals have not been prosecuted. In Nos. 79-1681 and 79-2087 the petitioner has expressed an intention to withdraw its appeals. See AEPCO Br. in No. 77-1634 at 1-2. In No. 77-1765 the petitioner has not filed a brief and did not appear at oral argument. The appeals in these three case numbers are accordingly dismissed
 We also decide today another set of consolidated cases involving the same parties, and based on similar facts. For convenience, we have labeled the instant group of cases "The 'Load Equation' Cases," and the related set of cases "The 'Storage Injection' Cases." See Arizona Electric Power Cooperative, Inc. v. FERC (The "Storage Injection" Cases), Nos. 77-1754 et al., --- U.S.App.D.C. ----, 631 F.2d 811 (D.C.Cir., May 22, 1980). In both cases we refer collectively to FERC and the Federal Power Commission (FERC's predecessor) as the "Commission."
 
 
 [2]
 El Paso's curtailment plan was the subject of this court's review in American Smelting and Refining Co. v. FPC, 494 F.2d 925 (D.C.Cir.), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), and City of Willcox v. FPC, 567 F.2d 394 (D.C.Cir. 1977), cert. denied, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978)
 
 
 [3]
 Joint Appendix ("J.A."), Vol. I at 111-112
 
 
 [4]
 J.A., Vol. II at 5202-5206
 
 
 [5]
 J.A., Vol. III at 5239-5263
 
 
 [6]
 Opinion and Order Issuing Conditional Certificate of Public Convenience and Necessity (Opinion No. 800) (FPC May 23, 1977), J.A., Vol. III at 5658-5683
 
 
 [7]
 Id. at 5676-5677. See Opinion and Order on Rehearing (Opinion No. 800-A) (FPC July 20, 1977), J.A., Vol. III at 5770, 5777-5778
 
 
 [8]
 Opinion and Order on Remedial Compliance Filing and Granting Conditioned Certificate of Public Convenience and Necessity After Statutory Hearing (Opinion No. 800-B) (FERC December 30, 1977), J.A., Vol. III at 5918-5939
 
 
 [9]
 In an attempt to avoid the evident mootness of its claims, AEPCO has belatedly argued that two factors keep this case alive. First, it argues that voiding the certificates "will enable the Commission to refund all of the EOC Priorities 1 and 2 surcharges" which were imposed on EOC high priority customers to pay for load equation. AEPCO Brief in No. 77-1634 at 7. Second, AEPCO claims that since only California's pro rata share of the Rhodes field storage gas was returned to EOC P-5 customers, it still has a live claim for the gas it was required to contribute to Rhodes storage, approximately 2.5 Bcf. AEPCO reply Brief in No. 77-1634 at 2-3. Neither of these claims, however, was ever presented to the Commission. Under section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1976), this court is empowered to review only those claims which "shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so." AEPCO never raised its surcharge claim at any time before the full Commission, much less in a petition for rehearing. Its claim regarding the Rhodes storage gas was also not raised. Indeed, AEPCO has never challenged El Paso's activation of the Rhodes field. On the contrary, AEPCO has contended that "The Proper Action" for the Commission would have been to deny certification for the California storage plans and instead utilize the Rhodes facility to meet EOC storage needs. See AEPCO Brief in No. 75-1952 at 29-30. AEPCO's last minute pleas cannot change the fact that these cases are moot
 
 
 [10]
 Opinion No. 800-B, supra note 8 at 13, J.A., Vol. III at 5931
 
 
 [11]
 Id
 
 
 [12]
 Id
 
 
 [13]
 Order on Rehearing of Opinion No. 800-B (FERC March 1, 1978), J.A., Vol. III at 5952, 5957
 
 
 [14]
 Id., J.A., Vol. III at 5955